# EXHIBIT A

WOODLAND TOWNSHIP MUNICIPAL COURT
BURLINGTON COUNTY, NEW JERSEY
SUMMONS NO.: S-12010-000058

x- - - - - - - - - - - - - - - - x
STATE OF NEW JERSEY, : TRANSCRIPT

-vs- : OF

DANIEL FRIED, : PROCEEDINGS

Defendant :
x- - - - - - - - - - - - - - - - x

Held at: 3943 Route 563
Chatsworth, NJ 08019

Heard on: December 7, 2010

B E F O R E:

THE HONORABLE RICHARD E. ANDRONICI, J.M.C.

**TRANSCRIPT ORDERED BY:**

MICHAEL J. ENGALLENA, ESQ.
(Office of the Attorney General)

APPEARANCES:

DEAN BUONO, ESQ.
Attorney for the State

DANIEL FRIED, Pro se

**TERRY GRIBBEN'S TRANSCRIPTION SERVICE**
Patricia Poole
27 BEACH ROAD - UNIT 4
MONMOUTH BEACH, NEW JERSEY 07750
(732) 263-0044 * FAX (732) 263-0075
**800 603-6212**
**www.tgribbentranscription.com**

THE COURT: Daniel Fried. You're charged on November the 20th with disorderly conduct by allegedly not complying with a lawful command to remove your hands from your pockets when requested to do so. And upon initiation of a frisk under 2C:33-2, that is a petty disorderly persons offense carrying with it a fine of up to $500 and/or a jail term of up to 30 days. You're also charged with resisting arrest by allegedly engaging in the physical altercation with three uniformed officers under 2C:29-2. That is a disorderly persons offense carrying with it a fine of up to $1,000, and/or jail term of up to six months.

You have the right, sir, to hire a lawyer if you can't afford one. The Public Defender will be appointed. Or you may represent yourself with no lawyer. What is your decision regarding the lawyer?

MR. FRIED: I've already engaged an attorney.

THE COURT: Who is your lawyer?

MR. FRIED: Alison Aryn (phonetic).

THE COURT: All right, I will need a letter from that person within one week. That's all for today. Thank you. Did you have a question?

MR. FRIED: I do. The Prosecutor's Office as well as the Officers involved in the arrest had already all agreed that the matter was being dismissed.

THE COURT: I don't want to hear anything about an agreement, sir, because there's, excuse me a second, there's no agreement in front of me today. I'm not trying to be discourteous to you.

MR. FRIED: I understand, Your Honor.

THE COURT: You have a lawyer.

MR. FRIED: I just came --

THE COURT: Excuse me a second if you would. I thought you had -- I asked you if you had a question. You started telling me, making a statement. I'm not going to allow you to do that. Not because I'm being discourteous to you. I have no, the only person that can tell me that there's an agreement in the case is your lawyer and the Prosecuting attorney when they come in front of me properly. And as a result I am not going to allow you to make any more comments regarding any alleged agreement. I will need a letter from your lawyer within one week. Thank you, sir.

(Court hears other matters)

THE COURT: State against Daniel Fried. I called this case earlier. Mr. Prosecutor, you put it back up.

MR. BUONO: Judge, the State's going to exercise prosecutorial discretion. With a stipulation of probable cause from the defendant and dismiss the

charges.

THE COURT: All right, the Prosecutor wants me to dismiss the complaints against with the understanding that you are stipulating without a request that there was probable cause for the issuance of the complaint. Is that what your understanding is and do you agree to that?

MR. FRIED: Yes, Your Honor.

THE COURT: All right, the charges against you will be dismissed. Thank you, sir.

MR. FRIED: Thank you.

* * *

**C E R T I F I C A T I O N**

I, PATRICIA POOLE, Certified Agency Transcriber, do hereby certify that the foregoing transcript of proceedings on Tape No. 1, Index 4990 to 5176, and Tape No. 2 Index 3678 to 3735, is prepared in full compliance with the current Transcript Format for Judicial Proceedings and is a true and accurate transcript of the proceedings as recorded in the matter of STATE v FRIED , heard by the Woodland Township Municipal Court, on **December 7, 2010**.

PATRICIA POOLE — 578 AOC Number

TERRY GRIBBEN'S TRANSCRIPTION SERVICE — 7/22/11 DATE

EXHIBIT B

PAULA T. DOW
ATTORNEY GENERAL OF NEW JERSEY
Richard J. Hughes Justice Complex
25 Market Street
PO Box 112
Trenton, NJ 08625-0112
Attorney for State Defendants, State Trooper S. R. Tetzlaff, State Trooper B.P. Oliver, State Trooper P.E. Brown and Superintendent Colonel Joseph R. Fuentes, in their individual capacities

By: Vincent J. Rizzo, Jr.
Deputy Attorney General
(609) 292-8550
Vincent.Rizzo@dol.lps.state.nj.us

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
VICINAGE OF CAMDEN

| | |
|---|---|
| DANIEL J. FRIED, Plaintiff, v. STATE TROOPER SR TETZLAFF, in his official & personal capacity; STATE TROOPER BP OLIVER, in his official & personal capacity; STATE TROOPER PE BROWN, in his official & personal capacity; SUPERINTENDENT COLONEL JOSEPH R. FUENTES, in his official & personal capacity; NEW JERSEY STATE POLICE, EAGLESWOOD TOWNSHP; and SOUTHAMPTON TOWNSHIP, Defendants. | HONORABLE RENEE MARIE BUMB<br><br>CIVIL ACTION NO. 11-2578 (RMB-KMW)<br><br>STATE TROOPER P. E. BROWN'S ANSWERS TO PLAINTIFF'S INTERROGATORIES |

Defendant, State Trooper P. E. Brown, through his undersigned counsel, hereby provides his answers to Plaintiff's Interrogatories.

PAULA T. DOW
ATTORNEY GENERAL OF NEW JERSEY

By: ____________________
Vincent J. Rizzo, Jr.
Deputy Attorney General

Dated: 1/17/12

**ANSWER:**

(a) Defendant responded to State Highway 72 at milepost 4 in Woodland Township in reference to an erratic motor vehicle operator complaint;

(b) At approximately 6:43pm a phone call was received by New Jersey State Police dispatch from a motorist advising of a white van that was driving all over the road. Defendant was dispatched to the location at approximately 6:56pm and arrived within seconds of being dispatched. Defendant departed the location upon the completion of the stop at 8:49pm.

7. In regard to the incident on November 20, 2010 involving the plaintiff which forms the basis of this lawsuit, state with specificity everything that happened from the time you arrived at the scene of plaintiff's arrest and detention until the time that you left that location.

**ANSWER:**

Defendant can not state with specificity everything that happened on the date of the incident giving rise to this matter, as it occurred over one year ago and Defendant cannot recall the events in specific detail. However, Defendant issued a report for this matter and based on the report he issued, he states as follows: On November 20, 2010, Defendant responded to an erratic motor vehicle operator complaint on State Highway 72 in the vicinity of mile post 4. Upon defendant's arrival at the location, he observed plaintiff's vehicle parked on the shoulder of the highway and saw plaintiff emerge from a wooded area and then enter his van. Defendant approached plaintiff while he sat in his van and identified himself. Defendant asked plaintiff if he was okay, but plaintiff did not respond as he looked down at the steering wheel of his vehicle. Defendant again asked the plaintiff if he required any assistance and plaintiff stated "What do you want?". Defendant noticed that plaintiff's eyelids were drooping and appeared to have slurred speech. Plaintiff then placed his head on the driver's side door as if he were sleeping. Due to the lack of the odor of an alcoholic beverage in plaintiff's vehicle and on his breath, and due to plaintiff's demeanor and physical appearance, Defendant asked plaintiff if he was having a medical complication and offered to dispatch EMS if needed. The plaintiff responded "No" to defendant's question and offer. Defendant then asked plaintiff where he was coming from and he responded, "Long Beach Island."

Defendant asked plaintiff to produce his driver's license, but

plaintiff refused to produce it and began talking to his dogs that were also in the vehicle. Defendant made several attempts to gain plaintiff's attention, but plaintiff did not respond. Defendant then asked plaintiff to exit his vehicle so he could continue to question him, as he was unresponsive to him while he sat in vehicle. Plaintiff exited his vehicle and was escorted to the front of his vehicle where Defendant continued to question the plaintiff in regard to his physical appearance. Plaintiff again refused to respond to Defendant's questions. Defendant then asked plaintiff if he was diabetic and plaintiff stated "Yes! You didn't know that?" Defendant asked plaintiff if he took insulin and plaintiff stated "No. Yes. No. I don't have diabetes, I told you that."

Plaintiff then began to walk towards the fog line on the shoulder of the highway, and defendant ordered him several times to remain off of the roadway for his personal safety; but plaintiff ignored defendant's orders. At this time, Trooper Tetzlaff arrived at the location. Defendant advised Trooper Tetzlaff of plaintiff's demeanor, and both Troopers approached the plaintiff for further questioning. Trooper Tetzlaff ordered the plaintiff to remove his hands from his front pants pockets, but plaintiff refused to follow the commands. Trooper Tetzlaff then attempted to perform a frisk of the plaintiff for weapons, but plaintiff resisted and continued to move away from the Troopers. Trooper Tetzlaff took plaintiff down onto the grass embankment to secure him, but plaintiff continued to resist handcuffing despite verbal commands to stop. A Pemberton Township Police Officer arrived to the location and assisted the Troopers in effecting plaintiff's arrest. During that time, plaintiff continued to resist handcuffing by turning his arms into his chest underneath this torso and by kicking his legs at defendant and Trooper Tetzlaff, which necessitated the use of mechanical force by defendant. Plaintiff was struck one time on his right leg. Plaintiff was eventually handcuffed, searched, read his rights per Miranda and secured in Trooper Tetzlaff's troop car.

Once in Trooper Tetzlaff's patrol car, plaintiff advised the Troopers that he was a diabetic, was in low blood sugar shock and needed some sugar. Emergency medical services was requested to be dispatched to the location. Virtua paramedics and Woodland Volunteer EMS personnel arrived to ascertain plaintiff's condition. The paramedics determined plaintiff's blood sugar was 26. The plaintiff was treated at the scene by the paramedics and was transported to Southern Ocean County Hospital for further evaluation and treatment. Defendant then departed the location.

CERTIFICATION

I hereby certify that I am the Defendant in the above captioned matter and that the foregoing statements made by me and/or my attorneys are true based on my recollection and personal knowledge.

I hereby certify that the copies of the documents and/or reports produced in this matter are exact copies of the entire documents or reports provided and have been assembled by attorneys and staff for the Division of Law as my counsel and reviewed by me.

I hereby certify that the existence of any other reports or documents which are relevant or are to be submitted at the time of trial are unknown to me; and if any such other documents or reports become later known or available to me, I shall serve them promptly on the propounding party. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Paul E. Brown

Dated: 1/10/12

**EXHIBIT C**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CIVIL ACTION NO. 11-02578-RMB-KMW

| | |
|---|---|
| DANIEL J. FRIED, PLAINTIFF, vs. STATE TROOPER SR TETZLAFF, in his official and personal capacity, STATE TROOPER BP OLIVER, in his official and personal capacity, STATE TROOPER PE BROWN, in his official and personal capacity, SUPERINTENDENT COLONEL JOSEPH R. FUENTES, in his official and personal capacity, NEW JERSEY STATE POLICE, EAGLESWOOD TOWNSHIP, AND SOUTHAMPTON TOWNSHIP, DEFENDANTS. | DEPOSITION UPON ORAL EXAMINATION OF: DANIEL J. FRIED |

COPY

TRANSCRIPT of the stenographic notes of the proceedings in the above-entitled matter, as taken by TRACEY L. PINSKY, a Certified Court Reporter and Notary Public of the State of New Jersey, at the law offices of LAYSER & FREIWALD, P.C., 1500 Walnut Street, Eighteenth Floor, Philadelphia, Pennsylvania, on Monday, July 30, 2012, commencing at 12:10 p.m.

JOHN F. TRAINOR, INC.
BY: TRACEY L. PINSKY
CERTIFIED COURT REPORTER
License NO.: XI002197

A By testing my blood sugar.
Q Do you use a meter?
A Yes.
Q Fingerstick?
A Yes.
Q How often do you do that?
A Five -- four to eight times a day.
Q Is there any -- do you carry your insulin, and whatever you inject it with, with you when you travel?
A Yes.
Q Always?
A I am insulin dependent.
Q Which means you have to have it with you all the time?
A Yes.
Q In addition to insulin, do you take other medication for diabetes?
A No.
Q When were you diagnosed with diabetes?
A When I was eight.
Q Eight?
A Eight.
Q Do you test your blood sugar with a meter

at regular intervals?
A Yes.
Q How often?
A Four to eight times a day.
Q Does that break into every two hours? You don't do it when you're sleeping at night, right?
A I take it at least before each meal, and the rest of the time as needed, at least before each meal, two times at night after dinner.
Q Okay. Now Paragraph Number 23, you see that?
A Yes.
Q It says, "On or about November 20, 2010, Plaintiff Daniel J. Fried was leaving his shore house on Long Beach Island".
Did I read that correctly?
A Yes.
Q What time did you leave?
A I don't know, maybe 5:30.
Q Was anyone else with you at the shore house that day?
A Yes.
Q Who?
A Both of my brothers and my nephew.

Q And did everyone leave together?
A In separate cars.
Q They all left at the same time?
A Yes.
Q Was there a plan to meet somewhere after leaving the shore house?
A We were going to dinner.
Q Where was that at?
A At a diner just off the bridge leaving the island.
Q And how far would that be from the shore house?
A 12 miles, maybe, 13 miles.
Q And did you actually stop at this diner or restaurant?
A No.
Q Did everybody else?
A Yes.
Q Why didn't you stop?
A This is when the incident in question occurred.
Q Other than to stop at the diner, where were you on route to after leaving the shore house?
A Home.
Q And how far is it from the shore house on

Long Beach Island to your home?
A An hour and 15 minutes, give or take.
Q You don't know in miles about how far?
A I'm afraid not.
Q How far was it from the shore house to where this incident took place with the State Police?
A 15 miles, 18 miles, maybe.
Q When you left the shore house, you understood there had been an agreement between everybody that you were all going to stop at this diner?
A Yes.
Q And by the time you got to the diner from leaving the house, did you forget that you were going to do that? Or was there some other reason why you didn't stop?
A I was having a diabetic episode.
Q And how soon after you left the beach house did the diabetic episode begin?
MS. ROBINSON: Objection.
THE WITNESS: I don't know how to estimate that.
BY MR. RIZZO:
Q Did it happen -- you said there is a

bridge going over?
A Yes.
Q Do you remember if it happened before you got to the bridge?
MS. ROBINSON: Objection. Lack of foundation, calls for a medical opinion as to when the episode started.
MR. RIZZO: Counsel, he experienced the episode.
MS. ROBINSON: I am noting my objection for the record. You don't have to argue with me. I'm objecting, as is my right to do.
BY MR. RIZZO:
Q Go ahead, sir. Did it begin --
A Prior to when I got to the bridge.
Q Prior to. And how did you know it was beginning?
A I don't know how to answer this question.
Q How did you feel?
A I was -- I became less than lucid very suddenly.
Q Okay. And that was before the bridge?
A I believe so.
Q Okay. Is this diner right after you get off the bridge?

A You'd have to define "right after".
Q Well, within, let's say, one mile of getting off the bridge?
A Yes.
Q Were you aware you were going past the diner when you did?
A No.
Q Were you aware of your surroundings at that time?
A No.
Q But you were aware you were having an insulin drop in your blood sugar level?
A No.
Q Okay. Were you in a state of confusion at that time?
MS. ROBINSON: Objection.
THE WITNESS: If that's how you'd like to use to describe it, yes.
BY MR. RIZZO:
Q What I'd rather have is you describe it for me.
MS. ROBINSON: Objection, that's not a question.
BY MR. RIZZO:

Q Yes, the question is describe it for me.
MS. ROBINSON: Describe what and at what time?
MR. RIZZO: Read back the question, please.
(Pertinent portion of the record is read back as follows:
"QUESTION: Okay. Were you in a state of confusion at that time?")
MS. ROBINSON: Same objection.
BY MR. RIZZO:
Q Go ahead and describe for me what your feeling, what your state was, when you first began to realize that you were having an insulin-related episode?
MS. ROBINSON: Objection.
THE WITNESS: There was no when I first began to realize. I was unaware of my condition or my surroundings.
BY MR. RIZZO:
Q Okay. So you're saying this was an immediate occurrence? There was no slow drop in your sugar where you began to feel different bodily changes?
MS. ROBINSON: Objection.

THE WITNESS: No.
BY MR. RIZZO:
Q No tingling of the arms?
MS. ROBINSON: Objection.
BY MR. RIZZO:
Q No lightheadedness? None of those things?
MS. ROBINSON: Objection.
THE WITNESS: I'm not sure where you are getting these things that supposedly happened, but no.
BY MR. RIZZO:
Q Okay. Were you -- as you came off the bridge and began to come closer to the diner, were you aware of your surroundings at that point in time?
A No.
Q What were you aware of, if you can remember?
MS. ROBINSON: Objection.
THE WITNESS: I can't.
BY MR. RIZZO:
Q You can't remember?
A No.
Q Do you remember any part of the trip between leaving the shore house and when you first encountered the State Police?

MS. ROBINSON: Objection.
MR. RIZZO: What is the objection?
MS. ROBINSON: You haven't established for the record that he remembers meeting the State Police, so that's an impossible question for him to answer.
MR. RIZZO: Then why are we here.
MS. ROBINSON: There is a police report. There is an MVR tape.
MR. RIZZO: With the State Police. Katherine, please, don't make absurd objections.
MS. ROBINSON: I'm not. I'm making objections that I'm entitled to do.
BY MR. RIZZO:
Q Mr. Fried, from the time that you came off the bridge, let's say, until you encountered the State Police, do you have a recollection of any of your travels?
A No.
Q Do you have a recollection of encountering the State Police?
A Not until I attempted to make them aware of what my situation was when I was in the back of the police car laying on my broken limb.
Q And that was after the initial interaction

between the two officers that you had some sort of communication with; is that correct?
MS. ROBINSON: Objection.
THE WITNESS: Yes, that is correct.
BY MR. RIZZO:
Q You don't remember anything that happened between you and the two troopers before you were in the backseat of the troop car trying to explain your situation to them?
A No.
Q Have you ever had a same or similar type episode prior to November 20, 2010?
A No.
Q Prior to leaving the shore house, when was the last time you had eaten?
A I don't know how to accurately answer that. I mean, we were working around the house eating constantly.
Q Okay. Does increased physical activity have an effect on your blood sugar levels, that you know of?
A You're asking me to state a medical opinion, yes.
Q No, I'm asking you your personal, what

happens to you personally.
A Yes, there are those occasions.
Q And were you engaged in physical activity at the shore house?
A Yes.
Q So when you were doing that, was there any awareness on your part that you had to make sure to eat something so your blood sugar would not vacillate so much?
A I am constantly aware of that.
Q Did you take any precautions to ensure your blood sugar would not drop when you left the house?
A I don't know how to answer that.
Q Did you or did you not? Did you eat? Did you take an insulin shot? Did you use the meter?
A I ate prior to leaving the house.
Q How long before you left the house?
A I don't know how to answer that.
Q Did you check the meter, use the meter to check your blood level when you left the house?
A No.
Q Did you give yourself an insulin shot in the hour preceding the time you left the house?

A No.
Q Two hours?
A No.
Q Three hours?
A I don't know.
Q Now, you said you've never had the same or similar type experience before?
A I did say that.
Q Okay. That's what I'm asking. During the time that you were driving from the shore house to the location where you encountered the State Police, have you driven that area before, on those roads before?
A Yes.
Q You were going westbound at that time, right?
MS. ROBINSON: Objection. What time?
BY MR. RIZZO:
Q Leaving from the shore house to go home, you were going westbound, right?
A North to the bridge, west.
Q Okay. And what routes would you normally take once you got to the bridge to the time you reached your home?
A I don't understand what you are asking.

EXHIBIT D



COMMISSION ON ACCREDITATION FOR LAW ENFORCEMENT AGENCIES
Incorporated

10302 Eaton Place, Suite 100 • Fairfax, Virginia 22030-2215 • Local (703) 352-4225 • (800) 368-3757 • FAX (703) 591-2206 • calea@calea.org

July 31, 2010

Colonel Joseph R. Fuentes
Superintendent
New Jersey State Police
Post Office Box 7068 River Road
West Trenton, NJ 08628-7068

Dear Colonel Fuentes:

Congratulations!

It is a privilege to advise you that your agency has met the requirements of a highly regarded and broadly recognized body of Law Enforcement Accreditation standards, and was awarded for a second time by the Commission on Accreditation for Law Enforcement Agencies, Inc., on July 31, 2010.

Your agency's Law Enforcement Accreditation represents the satisfactory completion of a continuous process of thorough agency wide self-evaluation, concluded by an exacting outside review by a team of independent assessors.

It also represents your agency's ongoing acceptance of the obligation to continue the quest for professional excellence by working toward fulfillment of any remaining applicable other-than-mandatory standards with which you chose not to comply during this Law Enforcement Accreditation activity, and any future standards promulgated by the Commission that may be applicable to your department.

Law Enforcement Accreditation of the New Jersey State Police is for three years. Your initial award date of July 28 will serve as the anniversary date for submission of required annual reports verifying your agency's continuing compliance with the standards under which you were awarded.

On behalf of the Commission on Accreditation for Law Enforcement Agencies, Inc., we commend you and the New Jersey State Police for demonstrating commitment to professional standards in policy and practice. Again, congratulations.

Sincerely,

Louis M. Dekmar
Chair

Sylvester Daughtry, Jr.
Executive Director

Commission on Accreditation for Law Enforcement Agencies, Inc.
New Jersey State Police
Certificate of Accreditation